(No. 56342.—

MERLIN C. STAMBAUGH v. INTERNATIONAL HARVESTER COMPANY, Appellant (Louisa Stambaugh, Special Adm'r, Appellee).

*Opinion filed April 4, 1984.—Rehearing denied June 29, 1984.*

GOLDENHERSH, J., took no part.
CLARK and SIMON, JJ., dissenting.

Cook, Shevlin, Keefe & Chatham, Ltd., of Belleville, and Flynn & Flynn, of Jacksonville (Bruce N. Cook and Leo F. Carroll, of counsel), for appellee.

Owen, Roberts, Susler & Murphy, of Decatur, and Lord, Bissell & Brook, of Chicago (Robert D. Owen, Forrest L. Tozer, Richard E. Mueller, Hugh C. Griffin and William E. McDaniels, of counsel), for appellant.

JUSTICE WARD delivered the opinion of the court:

The plaintiff, Merlin C. Stambaugh, brought a product liability action against International Harvester Company (Harvester), seeking damages for injuries received

on May 17, 1975. A jury returned a verdict for the plaintiff of $650,000 in compensatory damages and $15 million in punitive damages. The circuit court of St. Clair County ordered a remittitur in the punitive damages award to $7,500,000 and entered judgment in the amount of $8,150,000. The appellate court further reduced the punitive damages to $650,000 and affirmed the balance of the judgment. (106 Ill. App. 3d 1.) We granted the defendant's petition for leave to appeal. 87 Ill. 2d R. 315.

May 17, 1975, was an unseasonably warm day. The plaintiff, a farmer in Brown County, spent the morning discing a field with his model 706 Harvester tractor. As he prepared to return home for lunch, he noticed gasoline spurting out of the gasoline cap. Leaving the engine running, he dismounted from the tractor. He testified that the cap "just blew up" into the air and that gasoline "shot up" and ignited. Stambaugh was sprayed with the ignited gasoline and suffered burns. After removing his burning clothing, he walked home and his wife took him to Blessing Hospital in Quincy. Dr. Merle F. Crossland testified that he debrided and dressed the plaintiff's burns at the hospital. He recommended that Stambaugh enter the burn unit at a hospital in Springfield, but the plaintiff chose to remain at the Quincy hospital. It was determined there that the plaintiff had sustained burns on 45% of his body, including his back, neck, head, arms and hands. The burns were mainly of second degree with small areas of third-degree burns. The burns healed without grafting, but with some scarring. The plaintiff underwent daily hydrotherapy and debridement at the hospital. He was released after four weeks and last consulted a doctor for his burn injuries on October 3, 1975. The plaintiff's total medical expenses were less than $8,000.

The plaintiff testified that he was unable to farm or

to do carpentry work for a year and a half following the accident, but he did not offer any evidence of loss of earnings.

The tractor was manufactured by the defendant in 1963. The plaintiff bought it in 1971 as a used tractor. Immediately prior to his purchase, the tractor had been overhauled after 1,700 hours of use. The tractor was repaired by the plaintiff following the fire by replacing the damaged parts. No modification of design was made. At the time of trial the restored tractor had been operated for 872 hours.

In December of 1976, the plaintiff suffered what appears to have been a minor stroke and was hospitalized for a week. His physician, Dr. Henry C. Zingher, testified that it was his opinion that the plaintiff's stroke was caused, in part, by his tractor-fire experience.

The plaintiff filed a complaint in two counts in the circuit court of St. Clair County. The first count, based on strict liability, alleged that the plaintiff's injuries were a result of the defendant's having manufactured the plaintiff's tractor with a defective and unreasonably dangerous condition, *viz*, a gasoline cap inadequate to permit full ventilation of vapor pressure. The second count sought punitive damages, alleging that Harvester had recklessly manufactured the tractor with "wilful and wanton malicious acts of misconduct." Harvester, the complaint alleged, knew of the dangerous condition, but failed to take corrective measures. The jury returned a verdict of $650,000 in compensatory damages and $15 million in punitive damages. The compensatory damage award was not broken into items of damage by the jury. The circuit court entered judgment on the compensatory damages award, but, holding "that the verdict shocks the conscience of the court," remitted the punitive damages award by 50%. The appellate court also upheld the compensatory damages award but observed that it "ap-

proached the outer limits of a permissible verdict." The appellate court further reduced the punitive damages award to $650,000.

The defendant contends that its motion to transfer venue was erroneously denied; that the plaintiff's closing argument to the jury was highly prejudicial and produced a verdict based on passion and prejudice; that the plaintiff should not have been allowed to introduce evidence concerning other accidents involving different tractor models and different injuries; that it was deprived of a fair trial by the jury's deliberating in a courtroom which contained the plaintiff's and the court's trial notes, information concerning the defendant's insurance coverage, and other materials not in evidence; and that the punitive damage award was unsupported by evidence of wilful and wanton conduct.

The defendant made a pretrial motion to transfer venue out of St. Clair County on the ground that venue was not proper in that county. The motion was denied. The defendant's later motion for a change of venue to another judge within the county on the ground of prejudice was allowed. (See Ill. Rev. Stat. 1979, ch. 110, par. 501.) The defendant's first venue motion was renewed in its post-trial motion and was denied. The defendant says that its motion to transfer venue out of St. Clair County should have been allowed and it asks that we reverse the judgment and remand for a new trial.

Section 5 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 5), which is now section 2—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—101), which pertains to venue generally, in part provided:

> "Except as otherwise provided in this Act, every action must be commenced (a) in the county of residence of any defendant who is joined in good faith and with probable cause for the purpose of obtaining a judgment

against him and not solely for the purpose of fixing venue in that county, or (b) in the county in which the transaction or some part thereof occurred out of which the cause of action arose."

Section 6(1) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 6(1)), which is now section 2—102(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—102(a)), defined the residence of corporations for the purpose of venue:

"Any private corporation or railroad or bridge company, organized under the laws of this State, and any foreign corporation authorized to transact business in this State is a resident of any county in which it has its registered office or other office or is doing business. A foreign corporation not authorized to transact business in this State is a nonresident of this State."

The plaintiff's injury was sustained in the county of his residence, Brown County. The defendant, a Delaware corporation authorized to transact business in this State, has its international headquarters and its registered office in Cook County. International Harvester does not have an office in St. Clair County. In order, therefore, for venue to be proper, the defendant must be "doing business" in St. Clair County within the meaning of the venue statutes. (We would note parenthetically that in a different case (*International Harvester v. Goldenhersh* (1981), 86 Ill. 2d 366), the question of whether International Harvester was doing business in St. Clair County was raised. In that case, International Harvester sought issuance of a writ of *mandamus* to transfer the case to a different county on the ground of improper venue or an erroneous *forum non conveniens* ruling by the trial court. This court held that whether a corporation is doing business in a county for purposes of venue is to be reviewed by appeal rather than by *mandamus* and that the correctness of a ruling on *forum non conveniens* is to be reviewed by appeal and not

by *mandamus*.)

This court, in *Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, construed the language "doing business" as it is used in the context of the venue statute for the first time. The plaintiff-respondent in *Mosele* contended that venue would lie in Madison County on the ground that the petitioner's trains occasionally would cross the county boundary during the process of "yarding" the trains at a terminal and interchange facility, because the petitioner owned 6.25% of the stock of the independent railroad corporation which owned and operated the terminal and interchange facility, and because the petitioner's employees solicited business in Madison County and the solicitation generated a substantial amount of revenue for the company. The petitioner had no offices or operating facilities within the county, but its railroad cars and equipment were frequently used in the county by other railroads.

Observing that jurisdiction and venue are distinct legal concepts ("[j]urisdiction relates to the power of a court to decide the merits of a case, while venue determines where the case is to be heard" (67 Ill. 2d 321, 328)) and that the language of the statute relating to jurisdiction (Ill. Rev. Stat. 1979, ch. 110, par. 17, now Ill. Rev. Stat. 1981, ch. 110, par. 2—209) is "far broader" than the language of the venue statute, this court stated in *Mosele*:

> "A comparison of the literal terms of sections 6 and 17 [the section relating to jurisdiction] demonstrates that the legislature intended that more extensive contacts with a county are necessary to establish proper venue than are required when the issue is whether the defendant is subject to the jurisdiction of the courts of this State. It would be a distortion of the plain meaning of the words of the venue statute to hold that a corporation is 'doing business' within any county with which it has even minimal contacts. ***
> We hold, therefore, that in order to establish that a defendant is doing business within a county for purposes

of venue, quantitatively more business activity within the county must be demonstrated than where the question is whether the defendant has transacted any business within the State for purposes of service of process pursuant to section 17. The defendant must, in short, be conducting its usual and customary business within the county in which venue is sought. In the words of one Federal court faced with a similar problem of construction, 'the activity must be of such a nature so as to localize the business and make it an operation within the district.' (*Remington Rand, Inc. v. Knapp-Monarch Co.* (E.D. Pa. 1956), 139 F. Supp. 613, 617.)" (*Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 329-30.)

See also 1 C. Nichols, Illinois Civil Practice sec. 268, at 70-71 (Cum. Supp. 1983) ("[t]he 'doing business' provision of the venue statute is not synonymous with the test for establishing jurisdiction since the venue provision is more narrow and is intended to uphold the principle of convenience").

The court concluded that infrequent entering of B & O trains into Madison County and solicitation of business within the county by B & O's district sales manager was not sufficient to establish venue there. Too, although the Supreme Court of the United States had earlier judged the terminal and interchange facility to be "the *bona fide* agent and servant of every railroad line which shall use its facilities" for antitrust purposes, and despite the facts that B & O had an ownership interest in the facility and that a director of the facility was an officer of B & O, this court determined that the terminal and interchange facility was not the legal agent of the defendant because B & O did not exercise influence or control over the facility.

We believe that the appellate court erred in considering the situation here to be different from that in *Mosele*. The nature of visits by Harvester personnel within St. Clair County was similar to the infrequent, but regular, visits in *Mosele* by B & O field representatives to Madison County.

The defendant sold $2.6 million of its products to St. Clair County dealers in the 1976 fiscal year, but this is not dissimilar from the more than $10 million of business solicited in Madison County by B & O in a five-year period. Too, the sales of Harvester vehicles to St. Clair County dealers constituted approximately 5/100ths of 1% of its annual sales volume—an insignificant fraction of its total sales. It cannot be said that Harvester conducts its "usual and customary business within the county." See *Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 329.

Contrary to the plaintiff's contention that the defendant "maintains" the five dealerships in St. Clair County, the dealers are totally independent. Different from *Mosele,* where the B & O had a 6.25% ownership interest in the terminal and interchange facility, Harvester does not have an ownership interest in these dealerships. No officer, director or employee of any of the five dealers is an officer, director or employee of Harvester. The dealers are free to sell the products of other manufacturers and some do. Harvester's sales/service agreement with each dealer provides that "[t]he dealer is not the company's agent in any respect and is not authorized to incur any obligations or make any promises or representations in its behalf." The agreement also provides that Harvester will pay for half of the cost of any advertising by a dealer which contains the "I H" logo, but dealers are not required either to advertise or to include Harvester's logo if they do advertise. St. Clair's largest dealer typically spent $300 on advertising annually. A dealer may terminate the dealer sales/service agreement at any time upon 30 days' notice.

Sales by Harvester are on an FOB basis and are completed at its plants outside St. Clair County. Title is transferred to the dealer by issuance of a certificate of origin at the particular plant of manufacture. Harvester has no address or telephone within St. Clair County and pays no taxes there.

The plaintiff also relies on the circumstances that many of the dealers' purchases from Harvester are financed by the International Harvester Credit Corporation (IHCC) to support his claim of venue over the defendant in St. Clair County. IHCC is a wholly owned subsidiary of Harvester. In addition to financing Harvester vehicles, IHCC finances sales of products of other manufacturers. Harvester and IHCC are separate corporate entities in different businesses, having distinct objectives. See *Hopgood v. Anheuser-Busch, Inc.* (1983), 120 Ill. App. 3d 222; see also *DeGerlia v. First Bank & Trust Co.* (1984), 121 Ill. App. 3d 658, 661, where it was said:

> "For purposes of venue, the defendant must be found to 'be conducting its usual and customary business within the county in which venue is sought.' (*Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 329, 368 N.E.2d 88, 92.) It is not enough that the defendant make purchases or provide services incidental to its customary business. *Hartung v. Central Illinois Public Service Co.* (1982), 110 Ill. App. 3d 816, 443 N.E.2d 16; *Blakey v. Commonwealth Edison Co.* (1977), 52 Ill. App. 3d 454, 367 N.E.2d 529."

The acts of the subsidiary will not *per se* be imputed for purposes of venue to the defendant. See generally *Connelly v. Uniroyal, Inc.* (1977), 55 Ill. App. 3d 530, *aff'd in part and rev'd in part* (1979), 75 Ill. 2d 393; see also *Dregne v. Five Cent Cab Co.* (1943), 381 Ill. 594.

In *Blakey v. Commonwealth Edison Co.,* the court pointed out the importance of proper venue:

> "Proper venue is an important privilege which is given great weight in Illinois. For example, it was held in *Martin-Trigona v. Roderick* (1975), 29 Ill. App. 3d 553, 331 N.E.2d 100, that a waiver of venue clause in a lease is void as contrary to public policy. In *Heldt v. Watts* (1946), 329 Ill. App. 408, 69 N.E.2d 97, the court found venue improper and stated:
>
> > 'The legislature clearly meant to protect a defend-

ant against being sued in a county arbitrarily selected by a plaintiff, wherein the defendant does not reside, or in which no part of the transaction occurred which gave rise to the cause of action. If a plaintiff could so select the county to bring his suit, obviously a defendant would be entirely at his mercy, since such an action could be made oppressive and unbearably costly.' (329 Ill. App. 408, 414, 69 N.E.2d 97, 99.)

See also *Winn v. Vogel* (1952), 345 Ill. App. 425, 103 N.E.2d 673, where the court reversed for failure to transfer venue stating:

'The Practice Act *** provides that a defendant shall not be sued in actions like this, outside the county of his residence. There are exceptions, of which the only one pertinent here is that the suit may be in the county where the transaction, or some part thereof, occurred. *This is a valuable privilege conferred upon the defendant,* which he may waive, but his right to insist upon it in apt time by proper objection, motion or plea, has always been recognized. ***' " (Emphasis in original.) *Blakey v. Commonwealth Edison Co.* (1977), 52 Ill. App. 3d 454, 456.

In concluding that venue was improper in St. Clair County, we have been mindful that "[t]he provisions [of the venue statute] are to be liberally construed in order to effect rather than defeat a change of venue." (1 C. Nichols, Illinois Civil Practice sec. 259, at 253 (Supp. 1983), citing *In re Marriage of Cummins* (1982), 106 Ill. App. 3d 44.) Sections 5 and 6 of the Civil Practice Act pronounced a principle of convenience governing venue. (See 1 C. Nichols, Illinois Civil Practice sec. 258 (rev. vol. 1976).) In *Mosele,* this court stated:

"The Illinois venue statute is designed to insure that the action will be brought in a location convenient to the defendant, by providing for venue in the county of residence, or convenient to potential witnesses, by allowing for venue where the cause of action arose. Sunderland, *Observations on the Illinois Civil Practice Act,* 28 Ill. L.

Rev. 861 (1934)." (*Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, 328.)

To uphold venue over the defendant in St. Clair County "would have the effect of negating the principle of convenience upon which section 5 of the Act is based" and "would be to allow the institution of actions in locations with little connection with the defendant and with no connection with the activities which give rise to the suit." (67 Ill. 2d 321, 329.) The accident occurred and the plaintiff resided in Brown County. The defendant had its international headquarters and its registered office in Cook County. Additionally, the defendant had offices or manufacturing plants in Du Page, Lake, Sangamon, Peoria, Fulton, and Rock Island counties but none in St. Clair County. The county seat of Brown County is over a hundred miles from the county seat of St. Clair County and is closer to those of Sangamon, Fulton, and Peoria counties, where the defendant has offices. As far as we can determine from the record, the only witness from St. Clair County was Joseph Gerber, who testified for the plaintiff solely to establish venue. Gerber, who is an independent dealer of International Harvester trucks, also sells products of other manufacturers. He does not sell agricultural tractors or other agricultural equipment. Gerber's testimony did not serve to establish the events surrounding the accident to the plaintiff or the design or sale of any equipment manufactured by the defendant. He was called by the plaintiff only to testify that Harvester sold products to dealers with offices in St. Clair County. No witnesses from St. Clair County testified as to the accident, the injuries or the design of the tractor. The recognized "principle of convenience" was not served by the filing of the action in a county which had no connection with the accident or the product and was not the residence of either party or of any material witness.

The record shows that the defendant has only an insig-

nificant relationship with St. Clair County. Harvester does not design, manufacture, directly advertise, finance, or sell its products from within St. Clair County. We consider that the circuit court's denial of the defendant's motion to transfer venue from St. Clair County was an abuse of discretion (see *Morrison v. Community Unit School District No. 1* (1976), 44 Ill. App. 3d 315), and we remand for the entry of an order transferring the action to a proper venue. (See 3 C. Nichols, Illinois Civil Practice sec. 2504 (rev. vol. 1978).) In view of the disposition we reach, we need not consider the other issues raised on the defendant's appeal.

For the reasons given, the judgments of the circuit and appellate courts are reversed, and the cause is remanded to the circuit court of St. Clair County for further proceedings consistent with this opinion.

*Judgments reversed; cause remanded, with directions.*

JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.

JUSTICE CLARK, dissenting:

In this case, the plaintiff was grievously injured nearly nine years ago, and a costly seven-week trial was followed by costly and time-consuming appeals. Since I believe that neither justice nor public policy will be served by ordering a new trial on a close question of venue, I respectfully dissent. This dissent is based on my disagreement with the majority's interpretation of the venue statute. We have not determined the validity of the damage award rendered by the jury.

The defendant's business is essentially the manufacture and distribution of farm machinery, and it is reasonable to assume that a firm of this size will not market all of its machinery through its own business outlets. Harvester

must rely on independent distributors for an effective distribution network, and the independent distributors in St. Clair County served this function. The record reveals that gross sales to the retailers in St. Clair County totaled $2.6 million for the year 1976-77. Harvester field representatives visited St. Clair County regularly to assist the dealers in marketing Harvester products. Harvester reimbursed the dealers for one-half of their advertising costs, thus assuring that the "IH" logo would be prominently displayed in St. Clair County. The majority has determined that Harvester can market its goods in St. Clair County, advertise in St. Clair County, and earn substantial profits in St. Clair County, yet enjoy immunity from legal proceedings in that county. I believe this is a misinterpretation of the Illinois venue statute (Ill. Rev. Stat. 1981, ch. 110, par. 2—101).

I have difficulty resolving the inconsistencies between two major venue decisions by this court. In *Baltimore & Ohio R.R. Co. v. Mosele* (1977), 67 Ill. 2d 321, this court issued a writ of *mandamus* directing the defendant, as judge of the circuit court of Madison County, to enter an order transferring a disputed case from Madison County to a county of proper venue. In *International Harvester Co. v. Goldenhersh* (1981), 86 Ill. 2d 366, this court declined to issue a writ of *mandamus*, and allowed a lawsuit against International Harvester to proceed in St. Clair County. The court noted:

> "Five independent retail dealers which sell petitioner's products are located in St. Clair County. Petitioner reimburses the dealers for half of their advertising expenses. Various sales representatives, who are employees of petitioner, regularly visit the dealers to provide a wide range of assistance and service. Two of the dealers lease computer terminals from petitioner which link them to petitioner's warehouse for automatic inventory control and reorder of spare parts. ***
> *** Dealer contracts, which are entered into with petitioner annually in St. Clair County, give petitioner the

right to review dealer performance. Dealers are required to honor warranties on petitioner's products, and services performed by the dealers under such warranties are reimbursed by petitioner. Each dealer sells petitioner's spare parts, which are delivered regularly by petitioner in St. Clair County." 86 Ill. 2d 366, 371.

I realize that *International Harvester Co. v. Goldenhersh* left open the possibility that a venue determination could be made by the "normal process of appeal" (86 Ill. 2d 366, 373), but I believe that the disposition of the case at bar in light of this court's determination in *International Harvester* is not fair and reasonable. *International Harvester* involved the same corporation, the same trial judge, and the same venue question as *Stambaugh*. The appellate court relied heavily on *International Harvester* in deciding the venue question in *Stambaugh*. (Compare the language in *Stambaugh* (106 Ill. App. 3d 1, 18) with the language in *International Harvester* (86 Ill. 2d 366, 373).) I believe such inconsistent signals only exacerbate the problem of crowded dockets and interminable appeals which vex our judicial system. See generally Comment, *Mandamus and Venue,* 4 Am. J. Trial Advocacy 392 (1980).

The majority opinion notes that Harvester's business in St. Clair County constituted approximately 5/100ths of 1% of Harvester's annual sales in 1976. Harvester is an enormous company, and I believe that the total sales of $2.6 million are a more accurate yardstick of the term "doing business" than the percentage of total sales in one county. Harvester sells products all over the world, so it is not surprising that the $2.6 million sales figure is a minute percentage of its gross sales.

I do not agree with the majority's characterization of Harvester's activities in St. Clair County as "incidental." Harvester's products have been marketed and used for many years in St. Clair County, and such operations are

not incidental to some other activity that keeps Harvester in business. See generally Clermont, *Restating Territorial Jurisdiction and Venue for State and Federal Courts,* 66 Cornell L. Rev. 411 (1981); Note, *Doing Business as a Test of Venue and Jurisdiction Over Foreign Corporations in the Federal Courts,* 56 Colum. L. Rev. 394 (1956).

The majority implies that it would be "oppressive and unbearably costly" for Harvester to defend this suit in St. Clair County. I believe that this argument is more persuasive when made on behalf of the plaintiff. In this case, the plaintiff sustained severe burns over 45% of his body. He could not work for a year and a half, and he suffered a stroke as a result of the original injuries. I believe it could be "oppressive and unbearably costly" to try this case a second time. It appears that venue would be proper in Sangamon, · Will, DeKalb and Cook counties. St. Clair County is within 100 miles of the scene of the accident, and most of the witnesses reside near St. Clair County. I believe it is unfair to overturn this jury verdict and start all over again in a potentially distant forum. The bread and butter of Harvester is the distribution of farm equipment. Harvester maintains offices in Cook County for convenience, but its products are clearly designed for use in agricultural areas such as St. Clair County. To rule that venue is proper where Harvester's corporate offices are located, but not in an agricultural county where its products are sold and used, is a distortion of the venue statute.

I am convinced that justice will not be served by a second trial for an additional reason; the plaintiff's wife was substituted as special administrator during the pendency of this appeal and it can be assumed that he will not be available to testify in a second trial. The action will proceed, if at all, on behalf of Stambaugh's widow, as special administrator of his estate. Since this case turns on the factual events leading up to the burning of the plaintiff, his absence at a second trial will make it more difficult to estab-

lish the liability of the defendant. A cold transcript, read to the jury, will not have the same impact as the live testimony of the plaintiff, where his credibility and demeanor can be gauged in open court. In light of these facts, I am even more reluctant to set aside this jury verdict.

We must be mindful of the impact of overturning this jury verdict at such a late date. Public policy demands that each legal controversy must come to an end, and society's interests are not served by endless litigation spanning two decades. A second trial and the inevitable appeals will consume several years and it could be 1989 or 1990 before the litigation ends. If the majority believes that this holding will discourage lawsuits in plaintiff-oriented counties such as Madison and St. Clair, we should avoid making individuals pay a tremendous personal cost for such a determination. We should also be extremely wary of overturning jury verdicts on close questions of venue years after the tumult and shouting of the trial have ended.

I respectfully dissent.

JUSTICE SIMON joins in this dissent.